State of Illinois)
                 )SS:
County of Knox   )

---

## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS

---

FIRAS M AYOUBI,                        )
                                       )
     Plaintiff,                    )
                                       )        Cause:
                                       )
-VS-                                   )
                                       )
                                       )
J.B.,PRITZKER, LATOYA                  )
HUGHES, DOUG STEPHENS,                 )
KATHY GREER, ANGELA                    )        JURY TRIAL DEMANDED
CARLSON, TARRY WILLIAMS,               )
MONICA CARPENTER, ROB                  )
JEFFREYS, UNIV.OF ILL AT CHI.          )
                                       )
     Defendants                    )

---

### VERIFIED COMBINED CIVIL RIGHTS COMPLAINT

    COMES NOW THE Plaintiff FIRAS M AYOUBI, And hereby complains against J.B.PRITZKER governor of Illinois, LATOYA HUGHES the current Director of the Illinois Dept of corrections, DOUG STEPHENS transfer coordinator, KATHY GREER assistant to the transfer coordinator, ANGELA CARLSON correctional counselor at Dixon C.C., TARRY WILLIAMS Warden at Dixon C.C., MONICA CARPENTER Dixon C.C. Healthcare Administrator, ROB JEFFREYS Previous Director of IDOC, and UNIVERSITY OF ILLINOIS AT CHICAGO (and Director of Neuropsych) hereinafter "Defendants" as follows:"

I

## PRELIMINARY STATEMENT

This is a combined civil rights complaint under the Civil Rights Act 42 U.S.C. §1983 and both, the Americans with Disabilities Act and Federal Rehabilitation Act 42 U.S.C. §12101 et seq; 29 U.S.C. §794. The complaint alleges various claims arising from Dixon Correctional Center, Hill Correctional Center and IDOC headquarters in Springfield. The complaints allege widespread retaliation by a state employee in response to filed complaints against her. It is alleged that various supervisory personnel facilitated the retaliatory conduct in transferring plaintiff. Knowing that it was predicated by retaliation and had serious adverse affects to plaintiffs health and safety from a diagnosed neurological condition. Plaintiff further claims that his ongoing placement at Hill C.C. causes him injury in living and is unconstitutional and violative of the ADA, RA and the civil rights act. Plaintiff also claims deliberate indifference against UIC for refusing to accept him for treatment solely because he is incarcerated, inconsistent with contractual obligations and moral decency. Finally plaintiff claimed violations of due process, equal protection and the first amendment against defendants for subjecting him to disciplinary transfer discriminatory, retalitatory and because he excersised his first amendment rights to report abuse/assault, and report unlawful conduct by an employee.

## II
## FEDERAL JURISDICTION

Jurisdiction is based on Title 28 U.S.C. §1331 as it is a civil action arising under the United States Constitution pursuant to 42 U.S.C. §1983 and other federal statutes under 42 U.S.C. §12101 and 29 U.S.C. §794. Federal question jurisdiction is thus conferred upon the Federal court. The Federal court also has supplemental jurisdiction for the state law tort claims allged herein. The actions or omissions alleged in the complaint ocurred in Dixon Illinois (Northern District of Ill) Galesburg Ilinois (Central District of Illinois) and Springfield Illinois (Central District of Illinois) The USDC Central District has jurisdiction over these claims.

## III
## THE PARTIES

A: Plaintiff:

Firas Ayoubi Register number R-66956. Currently in custody at the Hill C.C. 600 S Linwood Rd PoBox 1700 Galesburg, IL, 61402

B: Defendants:

J.B Pritzker, Governor. 401 s Spring St.Springfield IL,62704
Latoya Hughes. Director, Ill Dept of Corrections 1301 Concordia Ct springfield IL

Doug Stephens. Transfer Coordinator. Ill Dept of Corrections

1301 Concordia Ct, Springfield, IL,

Kathy Greer, Assistant transfer Coordinator, Ill Dept of Corrections

1301 Concordia Ct, Springfield, IL,

Angela Carlson. Correctional Counselor. Dixon C.C. 2600 N Brinton

Ave, Dixon, IL, 61021

Tarry Williams. Warden Dixon C.C.. 2600 N Brinton Ave. Dixon,IL

61021

Monica Carpenter. Healthcare unit administrator. Dixon C.C. 2600

N Brinton Ave. Dixon, IL 61021

Rob Jeffreys. former Director Ill Dept of Corrections. 1301

Concordia Ct, Springfield, IL,

University of Illinois at Chicago Hospital (UI Health) 1740 W

Taylor Street, Chicago IL 60612

(UI Health Unknown Neuropsych dept director/coordinator)

T. Baker. Warden, Hill C.C. 600 S Linwood Rd Galesburg, IL,61402

Nelle Boone HCUA, Hill CC 600 S. Linwood Rd, Galesburg, IL, 61402

## IV

### LITIGATION HISTORY

Plaintiff has had extensive litigation history and has received at least three strikes under the PLRA. However he invokes the imminent danger exception to the PLRA's three strikes provision in light of substantial risk of harm. The following list is based on his memory alone and should not be considered complete because it is all he remembers.

Plaintiff discloses that he has not previously filed a lawsuit in
State or Federal Court dealing with the same facts involved in this
case. Ayoubi v williams is similar But is against warden at Dixon,
Director of IDOC who were parties for purposes of ADA. (Motion for voluntary dismiss
w/o prejudice was filed)

## PREVIOUS CASES

Ayoubi et al v Dart. USDC ND Ill. No: 13c0549. This was a religious
freedom case against cook county jail officials. It was dismissed
by the court.

Ayoubi v Dart. USDC ND Ill. No: 13c8301. This was a conditions of
confinement case. It was dismissed by the parties pursuant to
settlement agreement.

Ayoubi v Dart. USDC ND ILL. No: 14c1701.Plaintiff does not recall
the exact nature of this case but it was for deprivation of const.
rights at cook county jail. Plaintiff believes this case was dis-
missed by the court (may have received strike) This may be case (1703)

Ayoubi v Dart. USDC ND Ill. No: 14c1703 or 1704. This was a access
to courts claim against cook county officials at the jail. It was
dismissed as a sanction. Received strike for this case.

Ayoubi v City of Des Plaines. USDC ND ILL. No: 13c8556. This was a unlawful siezure and racial profiling case. Plaintiff was the prevailing party in this case.

Ayoubi v Dart. USDC ND ILL. No: 13c8343. This was a conditions of confinement case against jail officials. It was dismissed on summary judgment and affirmed in the Seventh Circuit.

Ayoubi v Smith. USDC ND ILL No: 14c3331. This was a unlawful search and siezure and excessive force case against cook county sheriffs police. It was dismissed by the parties pursuant to a settlement agreement.

Ayoubi v Basilone USDC ND ILL. No (unk). This was a employment discrimination case against Target corporation, Radioshack corp and various employees pursuant to 42 USC §1981. It was dismissed by the parties pursuant to a settlement agreement.

Ayoubi v Garbis. USDC ND ILL. No (unk). This was a legal malpractice case and defamation case against defense attorney and cook county states attorneys and judge. It was improperly removed to federal court by plaintiff and was dismissed. He received a strike for the improper removal.

Ayoubi v J.M.Swank Corporation. USDC ND ILL.  No: (Unk). This
was a Strict liability case against Monsanto and J.M.Swank. It
was dismissed under the doctrine of claim preclusion (because of
Ayoubi v Altez case below).

Ayoubi v. J.M.Swank corporation. Circuit Court of Cook Co. No:(Unk).
This case was pending in the Circuit Court of Cook Co. The disposition
was dismissed but the ruling of a motion to reinstate is unknown.

Ayoubi v United States USDC ND ILL. No.            . This was a
fraud/ICFA/privacy case filed against the United States under the
FTCA and various companies for identity theft perpetrated against
the plaintiff. This case was dismissed by the court and received
strike for improper application of imminent danger exception to
PLRA.

Ayoubi v Dart. USDC ND ILL. No:14c50. This was a excessive force
case against a cook county jail guard. It was dismissed as a
sanction by the court.

Ayoubi v Altez USDC ND ILL No:14c4306. This was a deliberate ind-
ifference case against a cook county jail physicians assistant.
Plaintiff prevailed on appeal in the Seventh Circuit. and the Case
was dismissed by the parties pursuant to a settlement agreement.

-7-

Ayoubi v Hanesbrands et al. USDC SD ILL. No (unk) This was a
ICFA/Strict Liability case against Keefe, Hanesbrands and Access
Co. It was dismissed by the court without prejudice because of
plaintiffs inability to establish greater than $75k in controversy
to invoke diversity jurisdiction.

Ayoubi v Wexford et al. USDC SD ILL NO: 18c1689-SPM. This was
a deliberate indifference case against Wexford and various medical
personnel at Pinckneyville C.C. It was dismissed on summary judgment
and currently pending on appeal.

Ayoubi v U.S.Bank et al. USDC ND ILL No: 21c6055. This case was
removed by the United States to federal court from the circuit
court of cook county. It is a fraud/ICFA/privacy case against the
United States, U.S.Bank, PNC, Verizon, Walmart corp. American Family
Insurance Co. and various other parties for faciliation of such
stated claims. It is currently on appeal in the Seventh Circuit
no 22-2216. It was dismissed by the distyrict court under the theory
of claim preclusion.

Ayoubi v U.S.Bank et al: Circuit Court of Cook Co. No(unk) This
case was removed to federal court (see above).

Ayoubi v Presence Health d/b/a Amita Health. Cook CO Court. No (unk)
this was a wrongful death negligence case. the disposition is unknown.

Ayoubi v Garbis Cook Co Court. No (unk). This was a legal malpractice case, It was dismissed under the theory of absolute immunity. Affirmed on appeal.

Ayoubi v Hanesbrands et al. Circuit court of lee Co. No 19 L 17. This is a strict liability case against Fila USA, Keefe Group and Hanesbrands Inc. It is pending.

Ayoubi v Wexford et al. Circuit Court of Lee co No 20-L-2. This is a fraud/ICFA case against Wexford and its officers for unlawful application of copays. It is pending.

Ayoubi v Tarry Williams. 23cv50110. This is a case filed in NDILL with similar claims as this instant case. However no maerit review has been completed on the merits. Plaintiff decided to bring the case instead in the CDILL because it has been broadened to include claims that took place at Hill c.c. and Springfield both in the CDILL. Plaintiff seeks to dismiss that case without prejudice.

Ayoubi v Hughes. This is a civil rights case filed in the CDILL alleging deliberate indifference to plaintiffs condition by the Warden and HCUA 's failure to provide single cell housing. This case was not dismissed on the merits. The judge denied leave to proceed IFP under imminent danger. It is pending on appeal (23-2689) 4:23-cv-04121-JBM

## V

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

Plaintiff exhausted all available administrative remedies to the best of his knowledge and belief.

## VI

## STATEMENT OF THE FACTS

### (facts pertinent to all counts)

1: Firas Ayoubi, the plaintiff is currently incarcerated at Hill C.C.

2: Prior to Hill, he was at Dixon C.C.

3: Plaintiff was issued a preliminary diagnosis by neurology at UIC for Functional Movement Disorder/Dystonia.

4: FMD and dystonia are mixed, neurological and neuropsychological movement disorders of the brain.

5: They are characterized by abnormal movements and posturing. Including twisting and jerking of extremeties.

6: In plaintiffs case, violent twisting of his torso and jerking of his arms and head among other things.

7: Stanford Medicine describes FMD/Dystonia as "unusual, involuntary movements or body positions. It is caused by a problem with the way signals are sent throughout the brain.

8: Stanford also explains that symptoms can be reversed through comprehensive treatment. Which includes "physical therapy,cognitive behavioral therapy, medication, hypnosis and neurobehavioral referral.

9: Uptodate.org Also characterizes FMD as abnormal functioning of the nervous system. That it "often begins abruptly...has a fast progression to disability and is associated with variable symptoms that wax and wane over time".

10: Uptodate states that management of the disorder begins with diagnosis and individualized treatment. For patients who do not improve with initial therapy are offered "motor retraining, physiotherapy, occupational therapy or speech therapy". Psychological therapies such as cognitive behavioral therapy "can be effective adjuncts to physical therapy either together or in sequence".

11: It goes on to state that "multidisciplinary rehabilitation in either in-or out patient models may be required for more complex longstanding and/or highly disabled patients.

12: Uptodate states that prognosis is "generally unfavorable in untreated cohorts".

13: Among precipitating factos of FMD are "panic attacks, neurologic disorder,  emotional event",among others.

14: Likewise that National Institutes of Health, Mayoclinic and Boston University Medical Center further affirm the same that is highlighted by Stanford Medicine and Uptodate.org. That FMD/Dystonia are complex, serious, debilitating and painful neuropsychiatric disorders.

15: In a prison setting, FMD/Dystonia can exacerbate injury among the other debilitating and painful symptoms. For example, cells in many institutions are comprised of steel, hardened wood fixtures and reinforced concrete in small spaces. As well as aggressive cellmates. This provides the formula for either (1) repeated assault or (2) repeated injury via trauma to the head and body from repeated hits to those fixtures or hits to cellmates.

16: Plaintiffs attending neurologist at UIC Dr Yasaman Kinirad ordered plaintiff to receive cognitive behavioral therapy, referral for neuropsych testing and further evaluation by the neuropsych specialist at UIC. She reccommended "weekly" CBT therapy through the neuropsych.

17: Plaintiff was along the way to receiving neuropsych evals treatments and ongoing CBT attempted by mental health professionals at Dixon C.C. A combined medical, and mental health treatment facility. Which apart from other institutions, has significantly more mental health and medical staff to accomodate inmates with special needs treatment. The facility also has on-site physical therapy.

18: While at Dixon, plaintiff had a medical hold. which is an alert on his masterfile to prevent unnecessary transfers from interfering with ongoing care or treatment.

19: As will be explained in detail below, plaintiff's medical hold was artificially removed by non medical personnel. Not for any medical purpose, but in order to accomplish retalliation for previously filed complaints. The outcome, which will be explained below, resulted in an arbitrary disciplinary transfer, which in turn led to multiple injuries and delay/cancelation in treatment.

20: Angela Carlson, a defendant, was previously assigned as the Dixon C.C. placement and assignment officer. Which is, the officer who decides what inmates get what jobs and where inmates are housed and with whom.

21: In 2021 plaintiff filed grievances and letters to the Governor personally, aswell as others complaining about a longstanding IDOC policy/custom of invoking discriminatory hiring practices for those who have sex cases. Regardless of the nature of the case, the facts, or the positive adjustment history of the inmate in IDOC. Plaintiff underscored in that letter that Dixon has a serious problem with corruption and discrimination.

22: The Governors office contacted the Director (Rob Jeffreys) who in turn (according to Carlson) contacted Dixon administration regarding the issues raised by plaintiff. Carlson told plaintiff that theres a new policy, no more "automatic denials". For individuals with sex cases. And that she put plaintiff in for jobs.

23: What Carlson did not tell plaintiff however, is that she told her clerk (an inmate) that she had intent on denying him jobs solely because he wrote the Governor.

24: Job requests at Dixon and IDOC are first generated through the vote sheet process. The first hurdle is the assignment officer, who is suppost to submit the vote sheet. Then, after approval by placement, it goes to the major, warden or programs or warden and internal affairs. This process takes typically 30 days to complete.

25: Angela Carlson also had a personal friendship and according to plaintiffs direct observations, a sexual relationship with inmate Malcolm Junious. This person was cellmates with plaintiff in 2021. He was investigated for having a cellular device in prison which he received from a staff member, and was investigated while he was cellmates with plaintiff. During the process of his investigation, Junious was transferred. Plaintiff was not disciplined. As observed by Carlson.

26:After investigating, plaintiff learned that Carlson submitted and denied plaintiff for the jobs within 24-36 hours. And after he learned about her statements to her clerk, and her dissemination of plaintiffs conviction information to other inmates, plaintiff believed she retaliated against him for writing the governor. He feared further retaliation, so he wrote another letter to the Governor, Director , inspector general and wrote grievances alerting IDOC of her conduct, and the threat of further retaliation.

27: During this time, Carlson was reassigned to a correctional counselor. Correctional Counselors have authority that is not possessed by officers. They have access to IDOC systems to submit inmates for transfers.

28: Although IDOC does have authority to transfer inmates, it does not have the authority to initiate transfers of a disciplinary nature in retaliation for an inmate exercising his first amendment right to file complaints. Nor can IDOC facilitate a disciplinary transfer without due process if it is aware the nature of the transfer was in response to complaints.

29: Approximately 2-3 months after plaintiff started complaining about Carlson's conduct, he was assaulted by an inmate who mistakenly believed plaintiff was lunging at him (because of his FMD/dystonia). This individual, Ronald Nigh, strangled plaintiff. Plaintiff did not strike Nigh. Nigh was ultimately disciplined, charged with assault and a KSF was put in place.

30: a KSF or "Keep seperate From" is an alert/investigative tool used by internal affairs to keep certain individuals seperated. Either in different facilities, or in different buildings.

31: Nigh and plaintiff developed a good relationship over time and about a year after the incident, no issues occurred.

32: According to IDOC policy. A facility transfer is not always done for KSF's. It varies on a case by case basis. And the determination of risk, is made by the internal affairs dept. in This instance, Lt Manzano at Dixon.

33: Lt Manzano, as well as the head of clinical services Mr Block represented to plaintiff that they were aware that there was no risk of harm between the parties and that they were not going to pursue processing of a facility transfer for any of the parties of the KSF.

34: Nigh nevertheless had multipl e disciplinary reports in his recent file. enough to get any inmate a disciplinary transfer. Nigh had no medical holds. And he had no job or program assignments.

35: Plaintiff was currently assigned a contract-based job assignment at the time. In addition to receiving medical/mental health treatment. He had a pending medical hold.

36: Plaintiff had a submitted grievance pending in the system. where he requested single cell housing because of repeated assaults by cellmates (elbowing them). He cited numerous instances, including an occasion when he was assaulted by the inmate that Carlson had a personal/sexual relationship with: Malcolm Junious. He also cited the instance where Nigh strangled him to support the need for a single cell.

37: Carlson decided to process the grievance even though she was (1) not the assigned grievance officer and (2) had a conflict of interest with plaintiff.

38: She not only denied the grievance, but decided to initiate her own independent investigation, sift through plaintiffs master file to uncover the active KSF. She reccommended a facility transfer of plaintiff. Even though she knew he was (1) the victim of assault and merely reported the incident (2) had medical holds and (3) was receiving treatment at Dixon (4) had an active contract program assignment and good disciplinary history.

39: After repeated attempts to ask Carlson to provide plaintiff and Nigh with the proper forms to request removal of the KSF, she began to impliment delay tactics. He at that point decided to go to Lt Manzano and her direct supervisor, Mr Block. These individuals told plaintiff that nothing is planned relating to transfering him.

40: Regardless, plaintiff approached a different counselor and asked him for help filing the KSF removal forms. Mr Reyes. He helped the plaintiff within 24 hours. Plaintiff subsequently signed to remove it, as did mr Nigh.

41: During this process, Carlson represented to plaintiff that she couldn't even submit him for a transfer "because you have medical holds".

42: Despite her statement to plaintiff. It became known to him even-
tually that Carlson lied to him and that in fact, prior to her stat-
ement, she collaborated with the Healthcare unit administrator , a
non medical decisionmaker, to remove the medical hold and submit
him for transfer.

43: Carlson provided false information to plaintiff in that she
couldnt submit him due to the medical hold.

44: She intended on plaintiff to rely on the purported truthfulness
of those claims in order to blindside him from filing timely comp-
laints to stop the transfer request.

45: She in fact, submitted plaintiff for a transfer to a disciplinary
type facility which she knew does not offer the medical/mental health
treatment available at Dixon. She submitted the transfer paperwork
and ommitted the critical mental/medical needs or medical hold from
Springfields transfer coordinators office: Mr Doug Stephens and his
assistant, Kathy Greer.

46: Plaintiffs sister Fatin Ayoubi called Block, the Warden Mr.
Williams, the Directors office, and spoke to the transfer coord-
inators office directly, and indirectly through the family liason
Ms Natalie Mason. She advised them that there is no issue between
plaintiff and Nigh, she advised them in detail about plaintiffs on-
going treatment, job assignment, medical holds, proximity to his

elderly mother, and the retaliatory actions and conduct by counselor Carlson.

47: Plaintiff similarly wrote all of these parties. The Governor, the Inspector General, Internal Affaris, IDOC Director, the Transfer Coordinator among others, pleading for them to stop the retaliatory transfer and explaining the effect it will have on his medical and mental health.

48: Plaintiffs sister contacted Senator Robert Martwick who in turn went out of his way to call IDOC to mitigate the issue and stop the transfer. His calls were disregarded by IDOC.

49: Likewise, the Governors office told plaintiffs family to simply "call the prison", that the issue cant be addressed by him. Despite the Governor being the highest level supervisor relating to IDOC.

50: In response to the emotional impact of the transfer, and symptoms relating to his FMD (which includes suicidal ideations) plaintiff had a panic attack and was placed on suicide watch. This stopped the transfer.

51: Carlson then approached platiniff afterwards while he was working and stated "oh your still here, did they keep your medical hold"? Plaintiff responded in a way to end the conversation.

52: It was at that point that plaintiff became aware that Carlson was relentless in her campaign to transfer him. Despite learning from her supervisor Mr Block that the transfer was "canceled", he knew she would not stop.

53: Not even two days after her new statement to him, the transfer was re-initiated to Illinois River.

54: Monica Carpenter is the healthcare administrator. She is a personal friend of Carlson and is with her on the ADA committee.

55: Carpenter admitted to plaintiff that she removed the medical hold at the request of Carlson. she stated she "didnt care" if plaintiffs treatment would be canceled. And insisted the "your not going to stop the transfer".

56: Plaintiff had a subsequent attack from symptoms of his FMD and was readmitted to suicide watch.

57: The next morning, Carlson collaborated with the Warden, Mr Williams, who knew the transfer was a product of retaliation, and requested an emergency disciplinary transfer to Henry Hill C.C., a correctional disciplinary medium-max akin to maximum security.

58: Mr Doug Stephens approved the disciplinary transfer knowing it was a product of retaliation simply because plaintiff was on suicide watch from symptoms relating to his disability.

59: Hill C.C. unlike Dixon, is an X-house style facilty (similar to Illinois Rivier and other Medium/Medium max facilities).

60: X-house style facilities have higher aggression inmates and significantly smaller cells than Dixon.

61: Hill C.C. has a fraction of the medical/mental health staff than Dixon.

62: Plaintiffs condition, as effecting almost every conceivable daily activity qualifies as a disability.

63: Since being at Hill, plaintiff receives zero treatment. The reason, as admitted to by mental health professional Howell, the lack of sufficient medical and mental health staff to provide treatment therapy or even CBT. She responded to him that "I'll try to learn it (CBT) but"I cant guarantee anything".

64: Plaintiff also seen the medical director/doctor, who stated that he cant do anything for him.

65: Since April 2023 to present day, plaintiff has been abused by cellmates, and has struck steel, concrete and wooden fixtures in the cell due to the lack of room to accomplish his daily activities because of the small size of the cell, the nature of his condition and

having to deal with sharing the limited space with cell mates. Who
show threats of assault.

66: Not to mention plaintiff is not provided any treatment and
suffers everyday.

67: Not only is single cell housing warranted, but placement in
this or similar institution threatens the health and safety of
the  plaintiff. It didnt happen often at Dixon because of the larger
cells.

68: IDOC has criteria for denying transfer requests either voluntary,
or involuntary requests, as the instant one. Among the reasons to
keep an individual placed at a facility are (1)critical medical
needs (2) critical mental health needs (3) proximity to inmates
need and other factors.

69: Notwithstanding that even if IDOC's position that they did not
transfer him out of retaliation or discrimination, and it was only
because of the KSF, that also would be unconstitutional because they
subjected victims of assault to disciplinary transfer forr merely
reporting an incident. Nevertheless plaintiff had met every critera
to not get transfered. Which includes critical mental health needs
medical needs and proximity to UIC hospital and his elderly mother
to visit him.

70: Indeed, IDOC transferred plaintiff from Pinckneyville (an xhouse medium max) to Dixon in 2018 for these reasons.

71: The state medical director and the office of health services alot facilitated this transfer knowing the impact it would have on plaintiffs treatment, and the danger inherent with a person with FMD being placed in small cells.

72: Various medical and mental health professionals at Hill believe plaintiff needs to be sent back to Dixon. Likewise the regional psychiatrist reccommended a transfer back to Dixon for plaintiffs medical and mental well being.

73: Because of all of these defendants actions and omissions, plaintiff is suffering injury everyday. and which they were aware, would occur.

74: They are all liable for every single injury he received between April 2023 through present day. Including but not limited to repeated trauma to his head and body on to steel, concrete and wooden fixtures.

75: Indeed trusted medical literature identifies that repeated blows to the head  (repetitive head injury syndrome) or blows to the head in general can cause TBI/mTBF (trumatic brain injury/mild traumatic brain injury) which can lead to CTE (Chronic Traumatic Encephalopathy) or SIS (Second Impact Syndrome) are all life threatening conditions which have long term complications and can be fatal.

76: This is in addition to the daily extreme pain from involuntary movements which is left untreated. The daily difficulty accomplishing the most fundamental life activities which includes but not limited to eating, sleeping, ambulating, dressing, washing etc. Missing meals and day room times so as to give cellmates room to get ready which often times results in missing meals because he cant get ready.

73: Because of these reasons, lack of appropriate care, lack of facilies and a current living condition that causes repeated injury that can cause death or long term complications, plaintiff is at imminent threat of injury and harm in living. His confinement, as it remains, offends the Eighth Amendment to the U.S.Const.

74: The Warden at Hill. C.C. Mr Baker, the Healthcare administrator Nellie boone and the Director of IDOC all have knowledge of the threat of harm in his current condition. They intentionally failed to escalate the issue to springfield and instead, offer plaintiff nonsensical remedies (a live in aid), which will not stop the movements, will not stop the injury, and do nothing to provide therapy or treatment for his condition. Instead, HCUA Boone demands plaintiff keep a cell mate, keep hitting his head until a catastrophic event where he would be unconcious enough to have a cellmate to press the emergency button.

75: Such a proposition by the Warden and ms Boone is gratuitous. It not only shows they are aware of the injuries, but refuse to provide single housing  on the premise that a cellmate would be there to press

the emergency button. Even though they are aware that plaintiff
would not be hitting fixtures at the same level if he didnt have a
cellmate. Such measures invite more injury, and violate the constit-
ution.

76: In fact, the Warden at Hill and HCUA have the option of requesting
an emergency transfer right back to Dixon, where the cells are
larger, and where plaintiff can get treatment. Instead they decide
to let him continue to repeatedly get injured and receive no treatment.

77: On consequences relating to repeated head injury, plaintiff asks
the court to take judicial notice of reputable medical sources incl-
uding the National Institutes of Health "consequences of repetitive
head impacts" https://www.ncbi.Nlm.Nih.gov, brainline.org on "repe-
titive head injury syndrome" Myoclinic.org on CTE, FMD/Dystonia,
and TBI traumatic brain injury.

78: UIC Neurology/Neuropsychiatry dept directors, despite knowing
the seriousness of plaintiffs condition, refuse to accept him to
go to UIC for treatment solely because he is an inmate.

79: UIC is under the contract between Wexford and the State of Ill.
to accept inmates from the IDOC for speciality treatment.

80: UIC receives state and federal funding for providing care to
inmates, such as plaintiff.

81: UIC knew plaintiff would suffer injury , exacerbation to his condition, and serious pain if left untreated. They intentionally disregarded the risk of harm and denied treatment by virtue of plaintiff being an inmate.

82: UIC and the unknown directors/appropriators misappropriated state and federal funds by this conduct. And they were unjustly enriched out of the detriment of the plaintiff.

83: Likewise, UIC owe plaintiff a duty of care, and contratual obligation to provide treatment.

84: Their intentional disregard and refusal to provide treatment constitutes a breach of that duty and breach of the contract.

## COUNT I

### RETALIATION, VIOLATIONS OF DUE PROCESS AND EQUAL PROTECTION AND FACILITATION THEREOF AGAINST ALL DEFENDANTS (first and fourteenth amendments, 42 U.S.C. §1983)

85: Plaintiff incorporates by reference para 1-84 as though fully set forth in this count 1.

86: Angela Carolson acted adversely against plaintiff by submitting him for a disciplinary transfer because he filed complaints against her and against an inmate she had a personal relationship with. An excersise of his first amendment right. She intentionally misled

plaintiff about his medical holds in order to prevent him from
having time to request removal of KSF. She in fact, prior to her
statement to him that she couldnt even submit him for a transfer
in fact, already set in motion the transfer proceedings. She collab-
orated with her friend Monica carpenter to remove his medical holds
to facilitate the transfer. Carpenter was aware plaintiffs treatment
would bea canceled and she was aware it was made for retaliatory
purposes.

87: Carlson not only acted in retaliation by subjecting plaintiff
(a victim of assault) to a disciplinary transfer. But violated his
right to due process and equal protection in that, such a transfer,
not only removes plaintiff from programs, jobs, groups at Dixon,
but also has strict disciplinary system distinct from Dixon. I.e.
as articulated by internal affairs LtMcCune at Hill c.c. akin to
"maximum security facility". 21 hours lockup per day. limited
movement, regular shakedowns, restricted access to programs and
services, and significantly further away from plaintiffs family.

88: Plaintiff not only lost access to see his family, and access
to programs , services and assignments, but also loss of access
to treamtment, rehabilitation and now, repeated injury, pain and
suffering. Carlson subjected plaintiff to discipline without notice,
a hearing or an opportunity to be heard.

89: Monica Carpenter was aware that Carlson was attempting to cir-

cumvent standard procedure (where the actual medical director at
the facility would remove the medical hold for medical reasons
after assessing the risk posed to the patient) by artificially and
unilaterally requesting removal of the holds for non medical purposes.
She was aware she was aiding and abetting the facilitation of a
retaliatory transfer. She was aware that the plaintiff would be
put at risk of harm, bodily injury in small cells, and cancelation
in needed treatment.

90: Warden Williams was aware that Carlson was subjecting plaintiff
to a punitive disciplinary transfer for non disciplinary retaliatory
purposes. In response to complaints made against her. He was aware
of this because of direct communications to him addressing the issues
in detail by plaintiff personally, and by plaintiffs family via
voicemails to his office and communications to his secretary.

91: Further, the warden was fully aware that plaintiff was being
sent to a max-like facility without having committed any violations
of rules that would warrant such a transfer. He was aware plaintiff
received no notice, hearing, or opportunity to be heard. The warden
had personal knowledge of the threat of retaliation and turned a
blind eye. Further he facilitated retaliation by signing off on
the emergency disciplinary transfer because plaintiff was on suicide
watch. A practice that is extremely forbidden by state policy.
He was aware plaintiffs treatment would be canceled and was aware
of the threat of physical injury.

92: Doug Stephens, Kathy Greer were made aware numerous occasions by plaintiff and his family regarding the impact to his health, medical care, the retaliatory nature of the transfer and they were aware of the risk imposed upon plaintiff. They instead, facilitated Carlsons retaliation and disregarded the risk to plaintiffs health and well being.

93: Further, they were aware Nigh and plaintiff were no threat to eachother, were aware they both requested removal of the KSF and were aware internal affairs had no problem with both of them being at the institution. They arbitrarily denied to remove the KSF in order to facilitate retaliation.

94: They further discriminated against plaintiff because he was on crisis suicide watch, implimented an even harsher transfer than the original one, because of his mental health condition.

95: They were aware of the potential for the injuries he sufferred thereafter and are liable for the same.

96: Governor Pritzker, and Rob Jeffreys were no  strangers to the potential for, and execution of retaliation by Carlson. They turned a blind eye and facilitated the retaliation because they were directly informed prior to, and after plaintiff learned of the impending transfer

they are liable for his injuries no less than Carlson.

## COUNT II

### DELIBERATE INDIFFERENCE AGAINST ALL DEFENDANTS
### (Eighth Amendment, 42 U.S.C. §1983)

97: Plaintiff incorporates by reference para 1-96 as though fully set forth in this count 2.

98: As stated in the previous 1-97 para of this complaint, FMD/Dystonia is an objectively serious medical condition.

99: Because of all of the defendants actions or omissions plaintiff suffered injuries to his head, elbow, repeated exacerbation of his condition , extreme pain from movements and delay/cancelation in treaments and appointments all because they decided to retaliate, aid and abbett, or facilitate the same.

100: Willams, Carlson, Carpenter, Pritzker, Greer, Stephens, Hughes and Jeffreys were all aware of (1) The seriousness of plaintiffs condition (2) the prior complaints against Carlson, (3) her propensity to further retaliate (4) the risks to plaintiffs health, safety and continuity of care in allowing the transfer (5) the eventual injury. They were aware because plaintiff made them personally aware, through either letters, direct communications, or direct communication to them by his sister.

101: The current Warden at Hill C.C. Mr Baker, and the HCUA Ms
Nellie Boone similarly displayed deliberate indifference because
they were aware that (1) plaintiff cannot control his movements
(2) that the cells are so small to accommodate two individuals
one with a movement disorder without causing serious head trauma
and body trauma on a daily basis (3) instead of putting him in
single cell housing or emergency transfer back to Dixon, essentially
gave him the only option of continued head trauma until manifestation
of unconsciousness or otherwise a life threatening event.


### COUNT III
### UNCONSTITUTIONAL POLICY,CUSTOM OR USAGE AGAINST THE
### ILLINOIS DEPT OF CORRECTIONS
(Monell v New York City Dept of Hum Servs, 42 U.S.C. §1983)


102: Plaintiff incorporates by reference para 1-101 as though fully
set forth in this count 3.


103: Based on plaintiffs observations over a multiple year span of
time. When a KSF transfer <u>does</u> take place, <u>if</u> not for any other
underlying reasons such as in plaintiffs situation, the indvidual
transfered or subjected to hardship, is the reporter of the assault.


104: Even if it is accepted by the defendants arguendo, that the
transfer was solely because of the KSF an no other reason. That
rationale would violate the first amendment. Because they have a
policy, custom or usage in punishing the victim, or reporter of assault.

COUNT IV

COMMON LAW FRAUD AGAINST ANGELA CARLSON

105: Plaintiff incorporates by reference para 1-104 as though fully set forth in this count 4.

106: Carlson knowingly and intentionally provided false and or misleading information to plaintiff and IDOC Springfield. She gave false information to plaintiff that she was not able to even submit him for a transfer because of his medical holds knowing she already set in motion the removal of the holds. She intended on plaintiff to rely on her mistatements in order to blindside him from stopping the transfer.

107: Similarly she lied on official documents through intra-state wires to Springfield relating to plaintiffs medical holds, medical treatments and mental health treatments. She did this with the intention on IDOC to rely on it to deprive them frmo having a reason to deny her request for transfer.

108:Her fraud caused injury and harm upon plaintiff.

COUNT V

BREACH OF CONTRACT AND UNJUST ENRICHMENT AGAINST UIC?UI HEALTH

108: Plaintiff incorporates by reference para 1-107 as though fully set forth in this count 5.

109: UIC/UI Health and unknown Neuropsch director were obligated to provide treatment to plaintiff and accept him per the Wexford/ IDOC professional service agreement/contract.

110: Further, under Illinois constitutional law they are obligated to provide medical care for plaintiff because they are a state entity.

111: They retained benefit financially from taxpayers, the state and the federal government to provide care for plaintiff.

112: They osed a duty of care to plaintiff by virtue of the constit- ution of Illinois, the united states and the PSA with Wexford.

113: They breached that duty, and that breach proximately caused harm upon the plaintiff

114: They retained benefit from public, private and federal funding to the detriment of the plaintiff. And their retention of such benefits violates the principles of equity, justice and good conscious.

## COUNT VI

### VIOLATIONS OF THE AMERICANS WITH DISABILITIES ACT AND REHABILITATION ACT AGAINST ALL DEFENDANTS
(42 U.S.C. §12101 et seq, 29 U.S.C. §794)

115: Plaintiff incorporates para 1-114 as though fully set forth in

this count 6.

116: As stated herein, plaintiff has a disability as articulated by the ADA/RA

117:His FMD symptoms affect almost every conceivable activity.

118: A record of this condition exists in plaintiffs medical records.

119: IDOC obtains federal funding for providing inmates with disabilities' such as movement disorders with specialized housing to prevent injury. Among the specialized housing is, single cell housing or housing in specialty medical/mental health facilities such as Dixon.

120: Dixon is among the only medium security medical mental health prisons in Illinois.

121: Housing plaintiff in a cell at Hill C..C knowing that it is causing him injury without providing him single cell or transfer to a prison like Dixon to prevent injury and promote rehabilitation amounts to exclusion from the program service or activity, and disc-rimination.

122: Likewise, exclusion from CBT therapy and other treatments offered only at Dixon.

123: Plaintiff is thus subjected to disparate treatment because of his condition.

124: IDOC failed to make reasonable accomodations in housing to prevent injury.

## COUNT VII

### WILFUL NEGLIGENCE AGAINST ALL DEFENDANTS

125: Defendants all were aware of state policy on transferring inmates when the transfer would interfere with the continuity of care.

126: Likewise, they had the option of avoiding all the harm inflicted on plaintiff by transferring the other individual.

126: THey were bound to excersise reasonable care when submitting transfer requests to investigate the risk of harm, "critical mental needs".."critical medical needs" and "proximity to inmates needs" they intentionally failed to apply policy in order to facilitate a known act of retaliation. They recklessly and callously disregarded risk to plaintiffs safety and health.

127: Their actions or omissions proximately caused harm upon plaintiff.

CONCLUSION AND PRAYER FOR RELIEF

WHEREFORE PLAINTIFF FIRAS AYOUBI prays this Honorable court Grant the following relief;

(a) $0 COMPENSATORY Damages, and;

(b) Issuance of TEMPORARY RESTRAINING ORDER/PRELIMINARY INJUNCTION, enjoining defendants to change housing conditions to prevent harm in a manner deemed appropriate by the Honorable Court, and;

(c) TERMINATION of Angela Carlson, and;

(d) JURY TRIAL, and;

(e) DECLARATORY RELIEF/PERMANENT INJUNCTION, or;

(d) Any other relief the Honorable Court deems fair, just & equitable

Dated & Certified On This 5 Day of September 2023 ad.

RESPECTFULLY SUBMITTED,

By: /s/

Firas Ayoubi #R66956
600 S Linwood Rd
Box 1700
Galesburg,IL,61402

**FILED** 9/11/23

SEP 1 8 2023

CLERK OF THE COURT
U.S. DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS 23-3274

To Clerk CDIL

From: Firas Ayoubi #R66956

Greetings, I sent out an identical case/complaint a week ago and I havent received notice of filing, or any updates in the Pacer system. If you already opened the case please disregard. However, if you opened the case already please file the attached Motion for IFP attatched.

Please let me know everything in writing: No law librarian here w/access to e-filing. Thank you.

Firas Ayoubi
#R66956
600 S. Linwood Rd
Po Box 1700
Galesburg, IL 61402